1

```
 1
 2
 3
 4
 5
 6
 7              EXAMINATION UNDER OATH
 8
 9                   MARK DeGEORGE
10
11
12
13
14
15        EXAMINATION UNDER OATH of MARK DeGEORGE, taken
16   at the offices of Rubin Fiorella & Friedman, on
17   Tuesday, March 21, 2006, commencing at 3:45 p.m.,
18   before MEL WINTER, a Shorthand Reporter and Notary
19   Public within and for the State of New York.
20
21
22
23
24
25
```

```
                                                                    2

 1
 2
 3    A P P E A R A N C E S:
 4
              RUBIN FIORELLA & FRIEDMAN
 5                 Attorneys for Defendant
                   292 Madison Avenue
 6                 New York , New York  10017
 7        BY:  JAMES MERCANTE, Esq., of Counsel
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1
2  M A R K    D e G E O R G E, called as a witness,
3        having been first duly sworn by MEL WINTER,
4        a Notary Public within and for the State of
5        New York, was examined and testified as
6        follows:
7  EXAMINATION BY
8  MR. MERCANTE:
9        Q     Good afternoon, Mr. DeGeorge.  We
10 represent your marine insurance company, Ace
11 American Insurance Company, with respect to a
12 claim concerning an injury to a guest aboard your
13 boat, Rene Holstein; is that pronounced properly?
14       A     Yes.
15       Q     We sent you a letter requesting an
16 examination under oath.  You are here today
17 appearing pursuant to our request for an
18 examination under oath, correct?
19       A     Yes, I am.
20       Q     In that letter we requested that you
21 bring with you some documentation.  I am referring
22 specifically to my letter dated March 15, 2006,
23 and items A through G.
24             And have you brought any of that
25 with you today?

                                                                18

1                        DeGeorge

2    sell for has an office in Hackensack, New Jersey

3    and from time to time I spend time there, or out

4    of my New York office, or on the road trying to

5    buy and sell product.

6         Q    Does the 36-foot Sea Ray that you

7    own, does it have any dinghy or tender?

8         A    No, not necessary.  I have it at a

9    dock.

10        Q    And on July 4, 2005, when the

11   accident occurred, to Rene Holstein --

12        A    Uh-huh.

13        Q    -- who was on board the vessel at

14   the time?

15        A    I was probably a mile away when the

16   accident occurred.  I was on a jet ski, riding.

17             I can tell you who was on the boat

18   that we took out.

19             Who exactly was on the boat and who

20   was on a raft and who was floating around and

21   swimming, I don't know.  I wasn't there.

22        Q    Start from that, the beginning of

23   that day.  Was Rene a guest of yours on the boat?

24        A    Absolutely.

25        Q    How long have you known Rene before

                                                                29

1                          DeGeorge
2    that she had any sort of physical damage to
3    herself.  Just looked like she was in a slow mode
4    that day.
5              And again, I didn't know her that
6    well.  After we had pulled in, right after the
7    fireworks, I then decided to take my skis back
8    home and flush them out with freshwater.  Rene
9    said she was going to take a nap, and when I came
10   back I was going to pick her up and drive her back
11   to her house in Great Neck.
12        Q    Did you do that?
13        A    No.  What happened was when we got
14   back from flushing out the skis, Rene was still in
15   the forward cabin sleeping and I said, Rene
16   something is not right.  You're sleeping all day.
17   What's wrong?
18             And she said, no, I just don't feel
19   good.  And she then went to the bathroom and let
20   out a scream, and apparently when she tried to
21   urinate, she filled up the toilet with blood.
22             At that point I was, you know,
23   panicky.  All I could think of was taking her to
24   the hospital, which I did; took her directly to
25   the Huntington Hospital.

                                                                  31

1                          DeGeorge
2     Everybody was going about their business.
3                Paul was talking on his phone.  He
4     told me he was on his phone.  He heard something.
5                Her friend, Francine, was laying on
6     a raft with her boyfriend, Noah.  They saw her
7     come out of the water, but didn't see her go in.
8                The other two people were also in
9     the water.  I will get their names.  I don't even
10    think Rene knows what happened.
11         Q    So you drove her to the hospital?
12         A    Yes.
13         Q    In your car?
14         A    Yes.
15         Q    Anybody else go with you?
16         A    Steven and Whitney went with me, but
17    in their own car.
18         Q    How long a ride is that from --
19         A    15 minutes.
20         Q    -- from your dock to the hospital?
21         A    About 15 minutes.
22         Q    And does she still have the ice pack
23    on at that time?
24         A    I don't remember.
25         Q    Did you talk with her during the car

33

1           DeGeorge

2    A    All she remembered is she was about
3    the dive into the water, and she remembers diving
4    off the boat and feeling some pain and popping her
5    head up and going back on the boat.
6              I tried to ask her what happened,
7    she didn't know.
8              As a matter of fact, she told me to
9    ask Whitney and Steven at the hospital if they saw
10   what happened.
11   Q    Rene told you to ask who?
12   A    Her friends.
13   Q    If they saw what happened?
14   A    If anybody got a full view of what
15   happened.
16   Q    What did they say?
17   A    Nobody had a clear-cut answer as to
18   what happened.  Nobody physically saw from the
19   second she got up on the back of the stern to the
20   time she popped her head out of the water, nobody
21   saw what happened to her during that whole amount
22   of time.
23   Q    Nobody saw her dive in the water?
24   A    Again, I can't answer for people.  I
25   was not there.  If somebody saw her dive in, they

```
                                                         37
 1                         DeGeorge
 2          A     Huntington Hospital.
 3          Q     What did you do there?
 4          A     We waited to find out what was
 5    happening.  It took hours.  I could not tell you
 6    how many hours.  But they performed all sorts of
 7    tests.  And they had come to the conclusion that
 8    she had damaged her kidney.
 9                It wasn't to the point where it
10    needed to be surgically removed, or irreparable
11    damage.  It's a kidney that heals itself.  And she
12    had a CAT scan, I believe, and she was
13    subsequently admitted.
14          Q     Admitted that night?
15          A     Yes.
16          Q     What did you do?
17                Did you stay the night?
18          A     No.  Her parents came.  Somebody
19    called her parents and Whitney, Steven and I left
20    after they admitted her.
21          Q     What time did they admit her?
22          A     I am going to say somewhere in the
23    3:00 to 3:30 area a.m.
24          Q     Were you told why they were
25    admitting her?
```

40

| | | |
|---|---|---|
| 1 | | DeGeorge |
| 2 | A | As I recall, it was a fair and sunny |
| 3 | day, but windy and the seas were choppy. Not -- | |
| 4 | choppy in Cold Spring Harbor means one to two feet | |
| 5 | is a lot. Normally it's flat. | |
| 6 | Q | Relatively calm conditions? |
| 7 | A | Not for Cold Spring Harbor, but |
| 8 | relatively calm, yes. It was also a lot of boat | |
| 9 | activity, 4th of July. So boat activity breeds | |
| 10 | waves. | |
| 11 | Q | Nobody suggested she was knocked off |
| 12 | the boat by a wave or something? | |
| 13 | A | No one suggested that. |
| 14 | Q | So how long did she remain in the |
| 15 | hospital? | |
| 16 | A | Well, she was -- I would say |
| 17 | somewhere in the six-day area. | |
| 18 | Q | Six to eight days? |
| 19 | A | Six days. |
| 20 | Q | Did you visit her again? |
| 21 | A | Yes, I did. I felt bad. I mean, |
| 22 | everybody just went out for a nice day. You are | |
| 23 | not supposed to get hurt on a nice day like that. | |
| 24 | Q | Do you know what -- while -- strike |
| 25 | that. | |

48

1                           DeGeorge

2    going to come after you for anything, you cannot

3    have discussed it with her.

4           Q     After the accident, did you notify

5    your broker?

6           A     I called my broker and I spoke.

7           Q     Whitmore?

8           A     Whitmore.  I spoke to Tom Citro.  I

9    spoke to a girl and mentioned to her there was an

10   incident on my boat, what should I do about filing

11   a claim.

12          Q     Do you know who it was?

13          A     No.  I was remiss.

14          Q     Do you remember when you made the

15   call?

16          A     Yes, about a week and a half after

17   it happened.  Just because I wanted -- honestly, I

18   wanted to make sure that the insurance I had just

19   bought was binding.

20                And she said no, your coverage is

21   fine.  If we get any phone calls, we will let you

22   know.

23                And I didn't think there was any

24   need at the time to report anything.  I wanted to

25   make sure my insurance is binding.

51

1        DeGeorge

2            Is GFI an insurance company?  You
3   would have to ask her counsel or her, but she has
4   medical coverage.
5        Q    So when did you first become aware
6   that there had been a claim asserted here, an
7   actual claim by her?
8        A    When your broker called me.  Your
9   adjuster called me.  When Ace's adjuster called
10  me.
11       Q    When was that?
12       A    Somewhere towards the end of
13  January.  You want to know exactly.  I saved the
14  message.  I can give you the time and the day.
15       Q    Yes.  Tell me what it says, if you
16  can.  Put it on the speaker.
17       A    I don't know how -- would you do it.
18  But I have no problem.  I don't have a speaker on
19  this phone.
20       Q    Then you can't.
21            Give me the sum and substance of it
22  and the date and time.  Mel will take it down.
23       A    Okay.  On February 1st, at
24  12:09 p.m.
25       Q    February 1st?

52

1        DeGeorge

2      A      Was the first notification I got of
3  a claim from Janet Thomas, who is an adjuster for
4  Ace Insurance Company.  She claims she had just
5  gotten handed a new claim assignment and to call
6  her back at 1-800-433-0385, extension 7278.  She
7  gave me the claim number as 796S1668282.
8      Q      And you called her back?
9      A      Yes.  Yes, immediately.  And she
10 asked me what I had done to report this, and I had
11 told her verbally I called my broker and also told
12 her that I contacted Ace to go on record, and I
13 gave her the report number that I was given, and
14 she said it meant nothing.
15             And she referred the research when
16 the insurance company was notified by Rene's
17 attorney.
18             Because I said to her, you are
19 condemning me now because I didn't -- according to
20 you, I may not have properly reported it.  Yet, I
21 know that I called the insurance broker back in
22 July and they said if we hear anything, we will
23 call you.
24             And they had suggested I call Ace,
25 and it was an automated system, and I never

62

1         DeGeorge
2    A    No.
3    Q    Did you provide anything in writing
4    to Inamar?
5    A    No.
6    Q    Did you leave any messages in the
7    automated system or --
8    A    There was no way to leave a message.
9    Q    What was the broker's response to
10   you about the accident?
11        Did they tell you how to file a
12   claim?
13   A    They told me to call back if I
14   needed to file a claim, and they told me they
15   would let me know if they heard anything.  I
16   didn't call them back, nor hear anything from
17   them.
18        I continued to date Rene; never
19   heard any mention of this until February 1st and
20   here we are.
21   Q    And I take it, though, from the
22   amount of years you have been boating and you had
23   insurance, you understand that it is a requirement
24   to present an insurance company with a notice of
25   claim of an incident or accident?    .

317 MADISON AVENUE, 21ST FLOOR
NEW YORK, NEW YORK 10017
(212) 925-1222

EXAMINATION UNDER OATH IN RE: MARK DeGEORGE
DATE: MARCH 21, 2006
WITNESS: MARK DeGEORGE

If there are any corrections to your deposition, indicate them on this sheet of paper, give the change, page number, line number, and reason for the change.

The reasons for making changes are:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct transcription errors.

PAGE **7** LINE **22** REASON FOR CHANGE **WRONG**
CHANGE **JOHN** TO **TOM**

PAGE **13** LINE **14** REASON FOR CHANGE **WRONG**
CHANGE **YES** TO **NO INSURANCE**

PAGE **8** LINE **4** REASON FOR CHANGE **ERROR**
CHANGE **MELISSA** TO **STACY OR HEATHER**

PAGE **41** LINE **9** REASON FOR CHANGE **wrong word**
CHANGE **Comma** TO **Coma**

PAGE **45** LINE **7** REASON FOR CHANGE **NEVER SAID**
CHANGE **COUNSEL CLAIMED** TO —

PAGE ___ LINE ___ REASON FOR CHANGE ___
CHANGE ___ TO ___

PAGE ___ LINE ___ REASON FOR CHANGE ___
CHANGE ___ TO ___

PAGE ___ LINE ___ REASON FOR CHANGE ___
CHANGE ___ TO ___

_____
MARK DeGEORGE

Subscribed and sworn to before me
this **26th** day of **April**, 2006.

_John Mazzei_                      March 6, 2007
(Notary Public)                    My Commission Expires:

JOHN MAZZEI
Notary Public - New Jersey
Bergen County
My Commission Expires March 6, 2007